# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

---

William J. Hicks,
　　　　Petitioner,


　　　vs.　　　　　　　　　　　Case No. 1:05-cv-774
　　　　　　　　　　　　　　　(Spiegel, S.J.; Black, M.J.)


Warden, Dayton Correctional
Institution,[1]
　　　　Respondent.

---

## SUPPLEMENTAL REPORT AND RECOMMENDATION

---

　　　Petitioner, who currently is in state custody at the Dayton Correctional Institution in Dayton, Ohio, has filed with the assistance of counsel a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his July 23, 2002 conviction and nine-year prison sentence following a jury trial in the Butler County, Ohio, Court of Common Pleas, where he was found guilty of 21counts of theft by deception in violation of Ohio Rev. Code § 2913.02(A)(3); one count of attempted theft by deception in violation of Ohio Rev. Code §§ 2913.02(A)(3) and 2923.02(A); and one count of engaging in a pattern of corrupt activity in violation of Ohio Rev. Code § 2923.32(A)(1).  (Doc. 1; *see also* Doc. 3, Ex. 1 (Counts 10-32) & Exs. 2, 5).

---

　　　[1] In the petition, petitioner properly named as respondent Deb Timmerman-Cooper, the Warden of London Correctional Institution (LoCI), because he was incarcerated at LoCI when the petition was filed.  It appears from the record, however, that Timmerman-Cooper no longer is petitioner's custodian, because petitioner is now incarcerated at the Dayton Correctional Institution (DCI).  (*See* Doc. 33, Tr. 6).  Because DCI's Warden is the individual who apparently currently has custody of petitioner, the caption of this case is hereby changed to reflect the proper party respondent.  *See* Rule 2, Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254.

The factual and procedural history of this case already has been extensively discussed in a prior Report and Recommendation issued June 20, 2007, which is incorporated by reference herein. (*See* Doc. 11, pp. 1-13). Essentially, the petitioner, William J. Hicks, and his two brothers, Daniel Hicks and Timothy Hicks, were indicted on charges stemming from a course of conduct from 2000 through January 26, 2001 in the operation of a construction company, APF Buildings, Inc. (APF), which was in the business of building pole barns and garages, before closing in January 2001. Daniel entered a guilty plea to most of the charges brought against him and testified against his brothers at their joint criminal trial. The jury convicted petitioner, who was the owner of APF, and acquitted Timothy Hicks on all counts.

In the petition, petitioner alleged as the sole ground for relief that he was denied the effective assistance of counsel when his retained trial attorney (1) failed to inform him of a plea offer extended by the State prior to trial; (2) prevented him from exercising his right to testify at trial; and (3) "failed to call witnesses and introduce evidence supporting innocence" at trial. (*See* Doc. 1, p. 5).

On June 20, 2007, the undersigned issued a Report and Recommendation recommending that petitioner's claim based on allegations that he was prevented from testifying at trial be dismissed with prejudice as waived, and that an evidentiary hearing be held with respect to the two remaining ineffective assistance of counsel claims. (*See* Doc. 11). On August 18, 2007, the District Court adopted the Report and Recommendation, dismissing the one claim as waived and remanding the matter for evidentiary hearing "on Petitioner's remaining . . . claims stemming from defense counsel's alleged failure to notify petitioner of a plea offer extended by the State, and failure to call certain witnesses to testify for the defense at trial." (Doc. 19, pp. 4-5).

After allowing the parties the opportunity to depose certain witnesses, an evidentiary hearing was held before the undersigned magistrate judge on January 9, 2008. (*See* Doc. 33).

The following witnesses testified at the hearing on petitioner's behalf: petitioner; David Brewer, the attorney who represented Timothy Hicks at the joint trial; and Gregory Howard, an attorney who represented petitioner at sentencing and at proceedings before the trial court on petitioner's motion for new trial filed prior to sentencing. (*See id.*). In addition, Timothy Hicks and petitioner's sisters, Becky Aldridge and Barbara Schweikert, testified on petitioner's behalf as rebuttal witnesses. (*See id.*).

The witnesses called to testify at the evidentiary hearing on respondent's behalf were Dan Ferguson, an assistant prosecuting attorney for Butler County, who investigated and prosecuted the state criminal case brought against the Hicks brothers; Brandon Voelker, an attorney who provided legal assistance to APF in closing its business in January 2001 and whom petitioner contends should have been called as a defense witness at trial; and petitioner's trial counsel, Michael O'Hara.  (*See id.*).

In addition to the exhibits attached to the return of writ (*see* Doc. 3), the record before the Court as developed further includes the transcript of the evidentiary hearing held on January 9, 2008, as well as the exhibits admitted into evidence at that hearing (Doc. 33); the transcript of the underlying state criminal trial (Doc. 16); the transcripts of Michael O'Hara's and petitioner's depositions, with corrections pages (Docs. 29, 32); and the transcript of a pretrial hearing held on May 9, 2002 on motions to sever filed by both petitioner's and Timothy Hicks' counsel, which were denied by the trial judge (Doc. 31).

It, therefore, appears that at this juncture petitioner's remaining ineffective assistance of trial counsel claims, which were remanded for evidentiary hearing, are now ripe for final adjudication.

## OPINION

### A.  Petitioner Is Not Entitled To Habeas Relief Based On The Claim That His Counsel Failed To Inform Him Of A Plea Offer Extended By The State

#### 1.  Evidence Adduced Re: Plea Negotiations And The State's Plea Offer

Both petitioner and Michael O'Hara testified that prior to the trial, they met together at least ten times and also talked many times on the telephone about the case.  (Doc. 29, Hicks' Deposition Tr. 6 & O'Hara's Deposition Tr. 9; Doc. 33, Tr. 10).  According to petitioner, he asked O'Hara "[m]ore than once" to approach the prosecutor about a plea bargain, and first stated his interest in plea-bargaining "several weeks before the trial" when he learned that his brother Timothy had been offered a deal.  (Doc. 29, Hicks' Deposition Tr. 33-34; Doc. 33, Tr. 10-11).  Petitioner testified that when he asked O'Hara if the prosecutor had offered him a deal as well, O'Hara responded that "no, there was nothing on the table at this time."  (Doc. 33, Tr. 11; *see also* Doc. 29, Hicks' Deposition Tr. 34).

3

O'Hara testified that he engaged in numerous discussions with the prosecutor prior to trial about the possibility of reaching a plea agreement. (Doc. 33, Tr. 116). A few of these discussions apparently were memorialized in notes attached as exhibits to O'Hara's deposition transcript. (Doc. 29, O'Hara's Deposition Tr. Exs. C-E). When O'Hara was asked on direct examination at the evidentiary hearing if petitioner was aware of these negotiations, the following colloquy ensued:

> A. . . .I can't say that Mr. Bill Hicks was aware of every time that I spoke to Dan Ferguson or that I was trying to get an offer out of the prosecution every time that I was doing it. I believe that he was aware and he was frustrated for a long time that the attempts were not successful in . . . getting an offer up to a point.
>
> Q. What were the terms that you suggested to the prosecutor?
>
> A. I suggested an extended period of community control or probation, and that was never acceptable to the prosecutor. I understood that a large part of the prosecutor's case was to make whole the complaining witnesses, and from the prosecution's viewpoint, that meant getting them to take back $267,000.
>
> I never got to the point with Mr. Bill Hicks of where he was going to come up with $267,000. I didn't believe that he had it to pay. And part of my talks with the prosecution were also designed in having attempts to have Bill not be responsible for the entire $267,000 or to bring it down to a number that might be more manageable for Bill Hicks. . . .
>
> Q. How did you decide to offer or to propose a community control type penalty when you discussed the plea bargain with the prosecutor?
>
> ****
>
> A. My client, Mr. Bill Hicks, said that he didn't want to do active jail time, and that's how I came up with that.

(Doc. 33, Tr. 116-17).

Dan Ferguson corroborated O'Hara's testimony that the parties had engaged in plea negotiations, which began "in very general terms very early on in the case."

4

(*Id.,* Tr. 62). Indeed, Ferguson argued at the July 3, 2002 hearing on petitioner's motion for new trial that petitioner had not been "wholly forthcoming" about the nature of the parties' plea discussions, and pointed out that O'Hara had come to him "on numerous occasions and requested plea bargain arrangements which would . . . result in no jail time for Bill Hicks." (Doc. 3, Ex. 4, Tr. 29). The prosecutor's office "absolutely rejected every single advance by Mr. O'Hara in that regard." (*Id.*). According to Ferguson, they were unable to "get very specific" in their negotiations until the week before the trial because O'Hara had made it clear "throughout the course of the . . . case that his client was not interested in any kind of plea bargain that would result in jail time," and "[t]he State was not going to . . . make any sort of plea bargain offer that would guarantee . . . that he wasn't going to do jail time." (Doc. 33, Tr. 62, 66).

The parties agree that a week before the trial, O'Hara and petitioner traveled together in petitioner's automobile from Covington, Kentucky to Hamilton, Ohio to meet with prosecuting attorneys Dan Ferguson and Lee Oldendick at their office, where a plea offer was presented to O'Hara outside petitioner's presence. (*See id.,* Tr. 12, 21, 63-64, 117-18). However, the witnesses have given differing accounts of this meeting, and the parties vehemently dispute the specific terms of the State's plea offer, whether O'Hara ever informed petitioner of the offer, and whether such offer was acceptable to petitioner.

a. **Petitioner's Version of Events.**

According to petitioner, the meeting resulting in the plea offer was arranged because he wanted to talk with the prosecutors "to make sure they had all the evidence, you know, that had to do with my case." (Doc. 33, Tr. 11; *see also* Doc. 29, Hicks' Deposition Tr. 34-35). Petitioner testified at his deposition that at the meeting, he began discussing with Ferguson and Oldendick why a "certain customer . . . didn't get his building," which caused Oldendick to lose his temper and "storm[] out" of the room. (Doc. 29, Tr. Hicks' Deposition Tr. 35-36).

Specifically, petitioner said that as he was talking, Oldendick "randomly pulled a file out and slammed it on his desk and was like what do you know about this customer, blah, blah, blah." (*Id.,* Tr. 36). Petitioner continued:
> . . . Mr. Olden[dick] pulled the file out and he was yelling, you're a
> liar, he's telling me this – I was trying to explain to him, well, this
> customer here, he said he was getting a divorce and he didn't want his

building anymore and it ended up being something else.  You're a liar, slammed it down, that's when he left. . . . (*Id.*).

At that point, Ferguson asked petitioner to leave the room also so that he and O'Hara could talk "alone for a minute." (*Id.*).  Petitioner stated: "Then I left the office, then we got back in the car and drove back to Kentucky." (*Id.,* Tr. 35).  Petitioner testified that during the drive back to Kentucky, he specifically asked O'Hara whether a plea offer had been made, and O'Hara replied, "[T]here's nothing on the table." (*Id.,* Tr. 40).

Petitioner testified at the evidentiary hearing that at no time before trial was he "ever told by Mr. O'Hara that there was an offer made by the prosecutors in which [he] might be able to plead guilty and somehow reduce the penalties that [he was] facing." (Doc. 33, Tr. 10).  Petitioner stated that he first learned of the State's plea offer after the trial ended, when his new attorney, Gregory Howard, asked him, "Why didn't you accept the deal?" (*Id.*, Tr. 16).  Petitioner responded: "What deal?  I never heard of any deal." (*Id.*).

Howard corroborated petitioner's account to some extent.  He testified that when preparing petitioner's motion for new trial filed prior to sentencing, he asked petitioner "if a plea bargain had been offered to him, and [petitioner] indicated that he had not ever been communicated a plea bargain or plea offer by his attorney." (*Id.*, Tr. 41).  Howard continued:

He was very surprised to learn that because it was his understanding that that had never occurred; that his attorney was preparing for trial; that there would be no plea offers in regard to his case; and he had no choice but to proceed to trial on the original indictment.

(*Id.*).

On cross-examination, Howard conceded that at the July 3, 2002 hearing on petitioner's new trial motion, he made a statement to the effect that O'Hara had informed petitioner of the existence of a plea offer extended by the State.  (*See id.,* Tr. 46).[2]  On redirect, Howard explained:

_____

[2]  Specifically, Howard stated at the July 3, 2002 hearing that he discussed the plea offer, as he understood it from notes obtained from David Brewer, with petitioner "after I got retained

6

. . . .The specifics of that plea bargain apparently were never, ever communicated to Mr. Hicks.  And so what the transcript said and what I wanted to explain was that, "They've made you an offer.  I'm not even going to tell you what it is because I think it's so ridiculous."  So there was never any substance of what the offer was that was ever communicated to Mr. Hicks, just that there's an offer, we're not going to take it, we're going to trial.

(*Id.,* Tr. 47).

Petitioner did not present any testimony regarding the specific terms of the State's plea offer.  Howard argued at the July 3, 2002 hearing on petitioner's motion for new trial that the offer "was that of the 23 counts, 22 would be nolled and the . . . remaining charge[, which was a felony-of-the-first-degree racketeering count,] would be amended to an F-2."  (Doc. 3, Ex. 4, Tr. 12; *see also* Doc. 33, Tr. 47).  Howard obtained this information from David Brewer, Timothy Hicks' counsel, who shared office space with Howard at the time of the trial and "outlined for [Howard] what he believed was the plea offer for Mr. William Hicks."  (Doc. 33, Tr. 40; *see also* Doc. 3, Ex. 3, "Affidavit of David Brewer" ¶7; Ex. 4, Tr. 11-12).

At his deposition, petitioner testified that he informed O'Hara in the car ride back to Kentucky from the prosecutor's office in Hamilton of his willingness to enter a plea to a three-year prison term.  (Doc. 29, Hicks' Deposition Tr. 40).  However, later on cross-examination, he said that "three . . . was just a hypothetical number because there was no plea bargain on the table," and he could not recall whether he ever discussed with O'Hara the number of years in prison he was "willing to accept in a plea bargain."  (*Id.,* Tr. 43-45).  Petitioner also testified that he kept asking O'Hara during the trial about the possibility of reaching a plea

in this case."  (Doc. 3, Ex. 4, Tr. 12).  Howard contended:

He knew nothing of that.  Nothing had ever been communicated to him.  *The only thing which had ever been communicated to him in this case was – well, they have made you an offer.*  I don't think it's worthy of anything.  I'm not going to accept it.  Never given the specifics.  Never told of his options.  Never kept apprised of what was going on in this case.

(*Id.*) (emphasis added).

bargain with the State, and "it was always nothing." (*Id.,* Tr. 41).[3]

## b. **Attorney O'Hara's Version of Events**.

According to O'Hara, the meeting resulting in the plea offer was arranged at Dan Ferguson's request for the purpose of talking "about the possibility of a plea agreement." (Doc. 29, O'Hara's Deposition Tr. 77; Doc. 33, Tr. 118). O'Hara testified at his deposition that before going into the meeting, petitioner told him he would not accept a plea that would involve a term of imprisonment and "was firm on that point." (Doc. 29, O'Hara's Deposition Tr. 78).

At the evidentiary hearing, O'Hara testified that when he and petitioner arrived at the prosecutor's office, Ferguson and Oldendick immediately "indicated that they wanted to speak with [O'Hara] outside of [petitioner's] presence" and had petitioner wait out in the hall. (Doc. 33, Tr. 119). O'Hara stated: "When I went in, they talked to me about Bill taking responsibility for this and about the plea agreement that they could recommend or could do and what they could do in exchange for the guilty plea." (*Id.*). O'Hara expressed his "memory of the plea offer" was that the racketeering charge would be dismissed; a certain charge would be reduced; petitioner "would have to serve some time in jail, possibly a year to a year-and-a-half;" petitioner "would be considered a good candidate for early release or shock" probation; and petitioner would be required to repay $267,000 in restitution. (*Id.,* Tr. 132-33).

O'Hara testified that he immediately informed petitioner, who was standing just outside the room, of the offer," but that petitioner was "adamant that he was not guilty, that he was innocent, and that an innocent person should not have to go to jail, should not do active jail time." (*Id.*).

According to O'Hara, petitioner went back into the room and began talking with Ferguson and Oldendick, telling them "what he had been saying all along, that he was not guilty; that this was not him; and he began to explain the actions . . . of his brother Dan Hicks." (*Id.,* Tr. 119-20). Oldendick then in a "loud trial lawyer's

---

[3] Two of petitioner's sisters testified as rebuttal witnesses at the instant evidentiary hearing regarding conversations between O'Hara and petitioner about the status of plea negotiations that the sisters had witnessed during the course of the trial. According to their testimony, whenever petitioner asked O'Hara whether a plea bargain had been offered, O'Hara would say, "No." (Doc. 33, Tr. 162, 166). The undersigned assigns no weight to this testimony, as the conversations occurred *after* the State's sole plea offer was made to and rejected by petitioner prior to trial.

voice . . . addressed . . . Hicks directly, and . . . explained that they were not going to listen to anything that . . . did not include . . . Hicks taking responsibility for his actions." (*Id.*, Tr. 120). At that point, O'Hara had petitioner wait out in the hall again as he "didn't want the deal or the offer that they made to get worse because Bill would not accept responsibility for what he did." (*Id.*). O'Hara continued:

> And so I sort of worked as an intermediary to, first of all, separate both parties who I considered at that point to be volatile and then do sort of shuttle diplomacy to calm down especially Mr. Oldendick who was sort of playing the role of bad cop and to settle down Mr. Hicks.
>
> I recommended that he consider the offer and . . . to consider it for what benefit it was to him. He was not interested at all in considering an offer that involved any jail time, any active jail time for him.
>
> Through the commute back riding in the same car with him, I again tested the waters and tried to talk about it. He was adamant. He refused to consider a deal that involved him doing active jail time. We never really did get to the subject of how he would return $267,000, which, to me, did not seem like a small detail.

(*Id.*, Tr. 120-21).

O'Hara testified that petitioner did not "change his mind concerning the State's plea offer" before the end of trial, and never expressed an interest in a plea bargain involving a term of imprisonment. (*Id.*, Tr. 121). Indeed, O'Hara testified that petitioner was "adamant that he would not consider that and would not exchange a guilty plea for active jail time." (*Id.*).

On cross-examination, O'Hara stated that he continued to talk with Dan Ferguson about the possibility of a plea bargain after their meeting the week before trial. (*Id.*, Tr. 131-32). O'Hara indicated in his deposition that "[m]ainly it was talk that Mr. Brewer[,Timothy Hicks' attorney,] initiated." (Doc. 29, O'Hara's Deposition Tr. 37). In one these discussions, involving Brewer, Ferguson, Oldendick and the trial judge, the judge "kicked [O'Hara] out or basically told [O'Hara] that [he] did not have any part in the meeting because it was regarding a plea negotiation between the other Mr. Hicks – Mr. Tim Hicks – and the prosecutors." (*Id.*). O'Hara said that although some of these "continuing

negotiations" involved his client, "the prosecution's offer never changed and Bill's firm insistence on not going to jail never changed and his insistence that he was innocent." (*Id.,* Tr. 88-89).

## c. **Assistant Prosecuting Attorney Ferguson's Version of Events.**

Dan Ferguson testified at the evidentiary hearing that he "will never forget" the meeting he had with O'Hara and petitioner the week before trial "because I thought it was kind of unusual." (Doc. 33, Tr. 63).  Ferguson stated:

> Mr. O'Hara and Mr. William Hicks walked into the prosecutor's office and requested to see me.  I believe my partner Lee Oldendick came in and sat with us.  The four of us discussed the case.  Lee and I didn't have much to say.  We didn't call the meeting.  Mr. O'Hara explained that Mr. Hicks was here because he wanted to face me and tell me that he was not guilty, that he didn't do anything, and that he didn't deserve to be going to trial.
>
> So I sat and listened, and Mr. William Hicks did exactly that where he reiterated that he hadn't done anything, he didn't feel like he was guilty, and he didn't think he should be going to trial and didn't want any part of this and felt we ought to I guess just dismiss the charges and apologize and let him go home.

(*Id.*, Tr. 63-64).

Ferguson said that petitioner then "got up and left the room;" and at that point, Ferguson spoke with O'Hara about the plea offer the State was willing to extend to petitioner.  (*Id.,* Tr. 64).  Ferguson testified:

> I said, "If you want to talk some sense into him, we will lower the Felony 1 to a Felony 2 and there will have to be three or four of the underlying charges pled to."  By the underlying charges, I mean some of the – some combination of F5s and F4s.  Then I said, "We will dismiss or merge the balance of the underlying charges."  And that was it.  I made that offer.

(*Id.*).[4]

According to Ferguson, and contrary to the position taken by petitioner's counsel at the July 3, 2002 hearing on petitioner's motion for new trial, the State's plea bargain would have required petitioner to plead guilty to more than the racketeering count.  (Doc. 3, Ex. 4, Tr. 26).  At that hearing, Ferguson argued:

> The substance of the plea bargain has been misstated to the Court. Whatever Dave Brewer thought, there were a number of discussions with Mr. Brewer about plea bargain opportunities for his client, Tim Hicks, as the Court is well aware.  The Court was involved in those discussions.  *Discussions of plea bargain opportunities for Tim Hicks were far more liberal than discussions of plea bargain opportunities with Mr. Bill Hicks.*
>
> And whatever Mr. Brewer thought he understood about Bill Hicks' plea offers, I think if that was something that this prosecutor's office considered at one point in time, I don't recollect it to be that way. . . .
>
> The day that Mr. [Bill] Hicks journeyed with Mike O'Hara to our office on Monday before trial, a specific plea bargain offer was offered to Mr. O'Hara after Mr. Hicks left the room.  And I discussed with Mr. O'Hara a reduction to an [F]-2 instead of an [F]-1.  And I also discussed that it would take a plea to several of the underlying felonies.
>
> And as I recollect, I think that three or four would have been required in order to be acceptable to the State, and additionally there would have been a requirement that the other felonies either be merged or reduced to misdemeanors.

(*Id.,* Tr. 26-27).

At the instant evidentiary hearing, the terms of the State's plea offer were

---

[4]  Ferguson could not recall whether Oldendick was present in the room when the offer was made, but said Oldendick "knew about the offer because we discussed it."  (Doc. 33, Tr. 64).

explored further during the following colloquy in Ferguson's cross-examination by petitioner's counsel:

Q.  And if I understand your offer, it was to plead to a felony of the second degree?

A.  As well as at least three or four, I don't think it ever was more specific than that – we'll drop the F1 to an F2 and there will be three or four of the underlying felonies, merge the balance, yes.

Q.  Felony of the second degree carries anywhere from two to eight years in the Department of Corrections?

A.  That's correct.

Q.  Depending on which felonies we're talking about, felonies of the fifth degree carry 6 to 12 months?

A. . . . .You're correct, 6 to 12 months for the felonies of the fifth degree.

Q.  Felony of the fourth degree, it would be 6 to 18 months?

A.  Yes.

Q.  And if there was at least one count of theft from an elderly person, so that would elevate it to a felony of the third degree offense; correct?

A.  That's correct.

Q.  And that would carry anywhere from one to five in the Department of Corrections?

A.  Yes, that's correct.

Q.  If I understand it correctly, there would be no agreement upon sentencing but the judge would decide sentence?

12

A. That's correct.

Q. All right. You never made an offer to William Hicks or Mr. O'Hara, I should say, that Mr. Hicks could plead guilty and receive somewhere in the area of a year and a year-and-a-half in prison?

A. *No. Absolutely not.*

Q. Did you make an offer at all to Mr. O'Hara that Mr. Hicks could receive a sentence and then be considered a good candidate for what was called shock probation?

A. *No. We discussed that kind of thing with David Brewer with regard to Tim Hicks. I don't remember any such discussion with regard – because in my mind, I was thinking of some term of years for Mr. William Hicks.*

Q. So being a candidate for some sort of release was not something you would have discussed with Mr. O'Hara regarding Mr. William Hicks?

A. Not to my recollection

**** 

. . . .But I can tell you that I did not have any sort of early release in my mind at the time I discussed this case.

Q. Your offer in the case did not extend to the point of reducing the Felony 1 down to a Felony 3, did it?

A. No. Absolutely not.

(Doc. 33, Tr. 71-73) (emphasis added).

On redirect, Ferguson testified that if petitioner had accepted the plea offer extended to him the week before trial, there was a "serious potential" that the trial judge "would have run the[] sentences consecutively" and "could very easily

13

[have] sentenced Mr. Hicks anywhere from 12 years to, say 14 potentially." (*Id.,* Tr. 80-81).  Ferguson stated further that "with the amount of evidence that we had in this case, I could easily see [the judge] doing that.  That would have been the maximum exposure." (*Id.,* Tr. 81).[5]

According to Ferguson, O'Hara refused the State's plea offer a few days after their meeting at the prosecutor's office.  (*Id.,* Tr. 73).  Ferguson testified:

> I called Mr. O'Hara or he called me, and I don't remember now who initiated the phone call, but sometime during that week before the trial Mr. O'Hara and I spoke on the phone and I said, "What's your client going to do?"  And his response to me was, "Bill insists that he's not guilty and he is not interested in a plea bargain that does[] involve jail time and wants to go to trial."  And I said, "Okay, see you Monday."

(*Id.,* Tr. 64).[6]

When asked if he had any reason to believe the State's plea offer had not been communicated to petitioner, Ferguson responded:

> No, absolutely not.  In fact, Mr. O'Hara didn't hesitate to tell me very quickly that William Hicks was not interested in the plea bargain, and it didn't surprise me because it was very – what he said to me was

---

[5] Other evidence in the record supports this testimony.  At the hearing held on July 3, 2002 on petitioner's motion for new trial, the trial judge pointed out that one of the plea discussions between O'Hara and the prosecutor occurred in his presence and involved his input regarding the sentence likely to be imposed if petitioner pleaded guilty to the racketeering charge.  (Doc. 3, Ex. 4, Tr. 40).  To ensure "there [was] no misunderstanding about that," the trial judge let O'Hara know unequivocally at that time that "if this defendant pled guilty to a racketeering charge, he would be treated harshly by this Court. . . .  That was conveyed directly to Mr. O'Hara, that if he came in here, and admitted that he was engaging in racketeering, . . . that I would treat that quite harshly.  I was likely to impose a severe sentence, which would approach the maximum sentence." (*Id.*).

[6] As transcribed, Ferguson stated that petitioner was "not interested in a plea bargain that doesn't involve jail time"  However, in light of the history of the parties' plea negotiations wherein petitioner remained firm in his refusal to enter a plea involving a prison term, the undersigned reads Ferguson's testimony to mean that petitioner was "not interested in a plea bargain that does[] involve jail time."

14

very consistent with what Mr. Hicks himself had said on Monday afternoon.

(*Id.,* Tr. 65).

Ferguson further testified that he had "no reason to believe that [petitioner] would have changed his position" regarding the State's plea offer during trial. (*Id.*).  Ferguson stated:

> Obviously, I didn't discuss anything with Mr. Hicks during the trial, but after his case was over and he was sentenced to prison and he went to prison, he sent me a number of letters; and in those letters he still continued to maintain his innocence.  So I don't have any reason to this day to believe that he ever changed his mind.

(*Id.*).

## 2.  Findings of Fact and Conclusions of Law

*Strickland v. Washington,* 466 U.S. 668 (1984), sets forth the relevant standard for determining whether or not a criminal defendant was denied the effective assistance of counsel at trial.  In order to obtain habeas relief based on such a claim, the petitioner must demonstrate: (1) his trial counsel made such serious errors that he was not functioning as the "counsel" guaranteed by the Sixth Amendment; and (2) counsel's deficient performance prejudiced the defense.  *See id.* at 687.

Under the first prong of the *Strickland* test, petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness based on all the circumstances surrounding the case.  *See id.* at 688.  In determining whether or not counsel's performance was deficient, the Court must indulge a strong presumption that the challenged conduct fell within the wide range of reasonable professional assistance.  *See id.*

Under the second "prejudice" prong of the *Strickland* test, petitioner satisfies his burden of proof with respect to his claim challenging his counsel's conduct at trial by showing that a "reasonable probability" exists that, but for his counsel's alleged errors, the result of the trial would have been different, or, in other words,

15

that the result of his trial would "reasonably likely have been different absent the errors." *See id.* at 694-95. With respect to his claim challenging his counsel's pretrial conduct in failing to notify petitioner of the State's plea offer, petitioner would satisfy the second part of *Strickland* test by showing that such error had a prejudicial effect on "the outcome of the plea process." *Hill v. Lockhart,* 474 U.S. 52, 59 (1985) (applying *Strickland* to guilty plea context). This means that in order to demonstrate prejudice based on such claim, petitioner must show a reasonable probability exists that, but for counsel's alleged error, he would have accepted the State's plea offer and would not have proceeded to trial. *Cf. id.*; *see also Griffin v. United States,* 330 F.3d 733, 737 (6th Cir. 2003) ("The second element of the *Strickland* test in the plea offer context is that there is a reasonable probability the petitioner would have pleaded guilty given competent advice.").

a. **Petitioner Has Not Shown O'Hara's Conduct Was Deficient.**

It is petitioner's position that his trial counsel acted unreasonably under the first prong of the *Strickland* test because he failed to adequately communicate to petitioner the plea offer made by the prosecutor prior to trial. As the Ohio Court of Appeals pointed out in its direct appeal decision (*see* Doc. 3, Ex. 9, p. 7), it is well-established that a "defense attorney's failure to notify his client of a prosecutor's plea offer constitutes ineffective assistance of counsel under the Sixth Amendment and satisfies the first element of the *Strickland* test." *See Griffin,* 330 F.3d at 737 & n.2 (and numerous cases cited therein); *see also Smith v. United States,* 348 F.3d 545, 552-53 (6th Cir. 2003); *Southerland v. Berghuis,* No. 04-73365, 2006 WL 1007888, at *9 (E.D. Mich. Apr. 14, 2006) (unpublished).

It is undisputed in this case that the prosecutor presented a plea offer to O'Hara outside petitioner's presence when petitioner and O'Hara traveled from Covington, Kentucky to Hamilton, Ohio to meet with the prosecuting attorneys at their office a week prior to trial. Therefore, the threshold issue before the Court is whether O'Hara in fact conveyed the plea offer to his client at that time. If the Court finds that O'Hara did not inform petitioner of the plea offer, the first prong of the *Strickland* test is satisfied; conversely, if it is found that O'Hara did convey the offer to his client, but that petitioner nevertheless rejected it, petitioner is

16

unable to prevail on his claim.[7]

Here, upon review of the entire record (which includes the evidentiary hearing held on January 9, 2008), the undersigned finds that O'Hara did in fact communicate the State's plea offer to petitioner, but that petitioner rejected it because he would be exposed to a prison sentence under its terms. In so finding, the undersigned is unpersuaded by petitioner's evidence to the contrary.

First, despite petitioner's suggestion that O'Hara did nothing in response to his repeated requests to approach the prosecutor about a plea bargain prior to trial, the undersigned is convinced that O'Hara in fact engaged in numerous pretrial discussions with the prosecutor to work out a plea deal that would be acceptable to his client. Both O'Hara and the prosecuting attorney, Dan Ferguson, testified that plea negotiations began soon after the indictment was returned, but that an impasse was reached because petitioner was adamant about not having to serve a prison term whereas the State refused to accept a deal that would result in no prison sentence for petitioner. Indeed, Ferguson testified that O'Hara on numerous occasions proposed plea bargains "which would . . . result in no jail time" for his client, but that each of these proposals was "absolutely rejected" by the prosecutor's office. (*See* Doc. 3, Ex. 4, Tr. 29).

It further can be inferred from evidence in the record that the parties sought to break the impasse between them by involving the trial judge in one of the plea discussions involving the possibility of petitioner's entering a guilty plea to the racketeering charge. To ensure there would be "no misunderstanding" about the type of sentence that would be imposed, the trial judge emphatically stated to O'Hara at that time that petitioner would be "treated harshly" and that the court

---

[7] No evidence has been presented that the prosecutor made any other plea offer to petitioner before or during trial. David Brewer, Timothy Hicks' counsel, stated generally in an affidavit that "at one point in time, according to my notes, a plea offer was extended to both my client and William Hicks." (*See* Doc. 3, Ex. 3, "Affidavit of David Brewer" ¶6). There is no evidence in the record, however, even remotely suggesting that Brewer was referring to another occasion in which a plea offer was made in both Brewer's and O'Hara's presence. Indeed, at the evidentiary hearing, Brewer could not recall whether he was present when the plea offer to petitioner was made. (*See* Doc. 33, Tr. 35). In any event, it appears clear from Ferguson's and O'Hara's testimonies that only one offer was extended by the State, which occurred at the meeting held at the prosecutor's office the week before trial. Therefore, petitioner's claim turns solely on whether or not O'Hara relayed that one offer to petitioner.

"was likely to impose a severe sentence, which would approach the maximum sentence." (*See id.,* Tr. 40).[8]

Second, contrary to petitioner's testimony at the evidentiary hearing (*see* Doc. 33, Tr. 10, 16, 40), it is clear from the record, at a minimum, that O'Hara told petitioner that a plea offer had been extended by the prosecutor. (*See* Doc. 3, Ex. 4, Tr. 12; *see also* Doc. 33, Tr. 46).

According to Gregory Howard, who prepared and argued the motion for new trial on petitioner's behalf, petitioner was not informed of the specific terms of the State's plea offer, but was only advised that "we're not going to take it, we're going to trial." (Doc. 33, Tr. 47). The undersigned gives little weight to this testimony, however, given that Howard was not present (nor any other person for that matter) when O'Hara told petitioner of the offer. Furthermore, petitioner has not established by way of any other evidence that O'Hara failed to inform him of the specific terms of the proposed plea bargain, and merely told him an offer had been made that "we're not going to take."

Indeed, it strains credulity that O'Hara did not discuss any of the details of the State's only plea offer with petitioner during the long car ride back to Covington, Kentucky from the prosecutor's office in Hamilton, Ohio. Petitioner has testified that during that car ride, he asked O'Hara whether a plea offer had been made and also expressed a willingness to enter a plea deal involving a prison sentence, and that O'Hara responded that there was "no plea bargain on the table." (*See id.,* Tr. 40; *see also* Doc. 29, Hicks' Deposition Tr. 40, 43-45). If in fact petitioner said these things as he claims, it is simply beyond comprehension that O'Hara would not have jumped on the matter right then and there, informing petitioner in great detail of the offer that had just been extended to determine whether petitioner would be willing to accept it. In any event, given the extensive plea negotiations that had already taken place, it is highly doubtful that O'Hara would not have immediately contacted Ferguson to notify him of petitioner's change in position on an important issue, which according to both parties, was the main reason why they were unable to break their impasse and talk in more specific

---

[8] It is noted that at the evidentiary hearing, Ferguson testified that if petitioner had agreed to enter a guilty plea to a reduced, felony-of-the-second-degree racketeering charge, petitioner could be sentenced "anywhere from two to eight years" in prison based on the reduced charge. (Doc. 33, Tr. 71).

terms about a possible plea bargain.

Petitioner himself indicated in his deposition that he and O'Hara had discussed "the pros and cons of entering into a plea bargain versus going to trial;" petitioner specifically stated that he knew he would receive "reduced time" if he entered a guilty plea, and that O'Hara told him: "[I]f I [were] found guilty on [all counts] that I was going to prison for sixty-five years, those were his words." (Doc. 29, Hicks' Deposition Tr. 38-39). In light of this testimony establishing that O'Hara in fact advised petitioner about the benefits of entering a plea bargain to reduced charges, as weighed against the sentence exposure he risked in proceeding to trial on all counts, the undersigned cannot accept petitioner's contention that O'Hara failed to notify him of, or consult with him about, the State's sole plea offer.

Finally, the undersigned is persuaded by certain testimony elicited from Ferguson at the evidentiary hearing that O'Hara consulted with petitioner about the State's plea offer, but that petitioner would not agree to it because under its terms, he would be subject to a prison sentence. Specifically, Ferguson testified that he spoke with O'Hara within a few days after the plea offer was made and that O'Hara told him: "Bill insists that he's not guilty and he is not interested in a plea bargain that does[] involve jail time and wants to go to trial."[9] (Doc. 33, Tr. 64).

O'Hara's response to the State's proposed plea bargain indicates that he did discuss it with his client, but that petitioner refused to accept the terms that were offered. Moreover, Ferguson's testimony that petitioner's reaction to the offer was not surprising, but rather was consistent with what petitioner had told him at their meeting a few days earlier, further confirms that the offer was communicated to and personally rejected by petitioner. (*See id.,* Tr. 65).

Certainly, the witnesses have given differing accounts as to the substance of the State's plea offer as well as the meeting in which the offer was made. With respect to the meeting, all witnesses agree that a conversation occurred wherein petitioner argued his innocence based on the evidence. Moreover, both petitioner

---

[9] *See supra* p. 14, n.6.

19

and O'Hara agree that prosecuting attorney Oldendick, who was present in the room at that time, strongly expressed his disagreement with petitioner's arguments to such a degree that Oldendick and/or petitioner ended up leaving the room. According to O'Hara, all of these events occurred *after* the plea offer had been extended and relayed to petitioner, whereas petitioner and Ferguson testified that these events occurred *before* the plea offer was made.

The undersigned assumes in petitioner's favor that the altercation with Oldendick occurred *before* the plea offer was extended, and, therefore, that petitioner did not personally respond to the offer at the meeting itself. However, this finding does not affect the undersigned's determination that O'Hara at some point conveyed and discussed the State's plea offer with petitioner before informing Ferguson a few days later of petitioner's rejection of the offer.

With respect to the plea offer itself, the undersigned is inclined to find that, as Ferguson has consistently recalled since 2002, the plea offer was for petitioner to plead guilty to a reduced, felony-of-the-second-degree racketeering charge in addition to three or four of the underlying theft counts, with the remaining counts

20

to be merged, dismissed or reduced to misdemeanors.[10]  In any event, although petitioner, O'Hara and Ferguson have each given different testimonies regarding the substance of the State's proposed plea bargain, all agree that the proposal included petitioner's plea of guilt to at least one charge carrying a prison term.  It is clear from the record that this was a huge stumbling block for petitioner.  Therefore, despite the conflicting accounts as to what the actual terms of the State's plea offer were, the undersigned remains convinced that petitioner was informed of the offer, but rejected it because he would be subject to a prison sentence.

**b.  Petitioner Has Not Shown Prejudice.**

Even assuming, *arguendo,* petitioner had established that his counsel failed to convey the State's plea offer to him, thereby satisfying the first prong of the *Strickland* test, petitioner must also demonstrate that such error had a prejudicial effect on "the outcome of the plea process."  *Hill,* 474 U.S. at 59.  In other words, petitioner must show a reasonable probability exists that he would have accepted the State's plea offer and would not have proceeded to trial if counsel had informed him of the offer.  *Cf. id.*; *see also Griffin,* 330 F.3d at 737.

---

[10]  The undersigned has doubts about O'Hara's and petitioner's memory of the State's plea offer.  Petitioner's position, which is based on David Brewer's notes and affidavit, is that the plea offer was for petitioner to plead guilty to a felony-of-the-second-degree racketeering charge with the remaining counts to be "nolled."  However, Brewer was Timothy Hicks' counsel, not petitioner's attorney, and there is no evidence in the record that Brewer was present when the offer to petitioner was made.  Moreover, as Ferguson pointed out early on, "[d]iscussions of plea bargain opportunities for [Brewer's client] were far more liberal than discussions of plea bargain opportunities for Mr. Bill Hicks."  (Doc. 3, Ex. 4, Tr. 26-27).  According to O'Hara, the plea deal included the dismissal of the racketeering charge, the reduction of another charge, a year to a year-and-a-half of jail-time to be served, petitioner's consideration as a "good candidate" for early release, and the payment of $267,000 in restitution to victims.  The undersigned gives credence to O'Hara's recollection that the plea offer included an agreement to pay $267,000 in restitution, as that appears to have been a significant hurdle for O'Hara in reaching a deal.  However, with respect to the other terms, O'Hara may have been confused by the plea negotiations for Timothy Hicks which continued into the joint trial proceeding.  Ferguson testified at the evidentiary hearing that the significantly more lenient terms recalled by O'Hara "absolutely [were] not" part of the offer he made to petitioner; Ferguson said: "We discussed those things with David Brewer with regard to Tim Hicks," not petitioner.  (Doc. 33, Tr. 72).

On direct appeal in this case, the Ohio Court of Appeals determined that petitioner failed to satisfy this second, "prejudice" prong of the *Strickland* test because (1) "petitioner never alleged that had he been informed of the plea offer, he would have accepted it;" and (2) the trial court made it clear to petitioner's counsel, that it would impose a "severe sentence, which would approach the maximum sentence," if petitioner were to enter a guilty plea to the racketeering charge. (Doc. 3, Ex. 9, pp. 7-8; *see also* Ex. 4, Tr. 39-40).

The undersigned is not persuaded by the state appellate court's reasoning. As an initial matter, petitioner was not required to demonstrate that he would have accepted the plea offer if he had known about it, but only that a "reasonable probability" exists that he would have accepted the offer. *Cf. Hill,* 474 U.S. at 59; *Griffin,* 330 F.3d at 737.

Moreover, the disparity between the plea offer and the defendant's potential sentence exposure in proceeding to trial on all charges constitutes "strong evidence of a reasonable probability that a properly advised defendant would have accepted a guilty plea offer, despite earlier protestations of innocence." *Smith,* 348 F.3d at 552 (and cases cited therein). Here, as the state appellate court emphasized, the trial court made it clear that it would impose a "severe sentence" approaching the maximum if petitioner were to plead guilty to the racketeering charge, which under the terms of the State's plea offer was reduced to a felony-of-the-second-degree. Ferguson testified that such a charge carried a maximum sentence of eight years, which is significantly less than the 65 year prison term petitioner testified O'Hara told him he risked receiving if he proceeded to trial and were found guilty on all charges.

Nevertheless, upon review of the entire record and under the circumstances of this particular case, the undersigned concludes that despite the wide disparity between the plea offer and petitioner's potential sentence exposure in proceeding to trial on all charges, petitioner has not shown that a reasonable probability exists that he would have accepted the State's plea offer to the extent it is assumed it was not conveyed to him.

Here, it is clear from both O'Hara's and Ferguson's recollection of the extensive plea negotiations conducted in this case, that petitioner refused to consider any deal involving a guilty plea to charges carrying a prison term. Although petitioner testified that O'Hara advised him of the significant sentence he

22

faced in proceeding to trial on all charges, as opposed to entering a plea for a reduced term, petitioner remained adamant and refused to bend on this point throughout the course of the trial in the belief that ultimately the jury would acquit him after considering all the evidence. According to O'Hara and Ferguson, petitioner never changed his position on this issue. Indeed, Ferguson testified that even after the trial was over and petitioner was sentenced to prison, petitioner continued to send him letters maintaining his innocence. (Doc. 33, Tr. 65).

In so ruling, the undersigned recognizes that a criminal defendant's repeated declarations of innocence do not prove that he would not have accepted a prosecutor's plea offer, and therefore, are not dispositive in determining the "prejudice" issue. *Griffin,* 330 F.3d at 738 (citing *North Carolina v. Alford,* 400 U.S. 25, 33 (1970), which quoted as follows from a state supreme court case: "reasons other than the fact that he is guilty may induce a defendant to so plead, ... and he must be permitted to judge for himself in this respect"); *see also Smith,* 348 F.3d at 551-52. However, in this case, the undersigned finds that despite the wide disparity in the sentences petitioner faced and was advised about, he opted to proceed to trial where he might be acquitted rather than plead guilty and serve a reduced sentence. Therefore, it is not reasonably likely he would have entered a guilty plea to the State's plea offer which required him to plead guilty to charges carrying a prison term.[11]

Accordingly, in sum, because petitioner has not demonstrated that his counsel failed to inform him of the State's plea offer or that it is reasonably likely he would have accepted the plea offer that was extended in this case, petitioner is not entitled to habeas relief based on his first claim of ineffectiveness by trial counsel.

---

[11]  It is noted that even if petitioner would have accepted the plea offer that most likely was extended by the State, he was subject to a maximum prison sentence of 12 to 14 years. (*See* Doc. 33, Tr. 80-81). Petitioner ultimately was sentenced to a nine-year prison term, which poses the question whether he would obtain any benefit from the granting of the writ with the appropriate remedy being the reinstatement of the State's plea bargain.

**B. Petitioner Is Not Entitled To Habeas Relief Based On The Claim Stemming From Counsel's Failure To Call Brandon Voelker As A Defense Witness**

Petitioner has alleged that his trial counsel, Michael O'Hara, was ineffective because he failed to call (or subpoena) attorney Brandon Voelker as a defense witness. According to petitioner, Voelker, who provided civil legal assistance to APF in closing its business in January 2001, would have provided critical testimony favorable to the defense to show petitioner lacked the requisite criminal intent to commit the charged theft-by-deception offenses, which also formed the basis for the additional racketeering charge.

**1. Background:  State Post-Conviction Proceedings**

The following evidence was presented by petitioner to the state courts in support of his ineffective assistance of counsel claim: (1) David Brewer's affidavit, which was attached as an exhibit to petitioner's motion for new trial filed in June 2002 prior to sentencing; and (2) Voelker's affidavit, which was attached as an exhibit to petitioner's state post-conviction petition filed in November 2003.  (*See* Doc. 3, Exs. 3 & 14).

Brewer generally averred that O'Hara "for reasons unknown, did not subpoena a witness on behalf of his client, Mr. Brandon Voelker, who, based upon my conversations with Mr. O'Hara, was a critical witness to his client's defense." (*Id.,* Ex. 3, "Affidavit of David Brewer" ¶13).  Voelker, with more specificity, stated that during the time he provided legal assistance to APF, petitioner "expressed . . . a genuine desire to satisfy all the contracts" and "wanted to explore the potential of declaring bankruptcy on some contracts and still working on many of the other contracts." (*Id.,* Ex. 14, attached Def. Ex. O, ¶¶8-9).  Voelker further averred in pertinent part:

> At no time did I believe the information and documents presented to me indicated any criminal behavior by William Hicks.  Had I suspected any criminal responsibility, I would not have continued my representation.  I saw the matter as being entirely civil in nature.
>
> ****
>
> I spoke with Mr. O'Har[a] regarding this matter extensively.  I

24

informed Mr. O'Har[a] of my belief that Mr. Hicks did not
demonstrate intent to take money and not perform on the contracts.

I informed Mr. O'Har[a] I would be willing to testify.

Mr. O'Har[a] called me during the trial of this matter.

He told me the trial was wrapping up and I would be called the next
day to appear.

He told me it was about a 35-minute ride to the courthouse.

I never put any condition on my appearance as a witness.

I never expressed to anyone an unwillingness to appear as a witness.

I waited the entire next day and never received a phone call to appear
in the trial of this matter.

****

Having read the records of the bank accounts, APF business records,
my conversations with William Hicks, my contacts with Firststar, my
conversations with the lawyers for many of APF's customers[,] I
believe I would have been a benefit to Mr. William Hicks as a witness
in the criminal trial accusing him of stealing money f[ro]m APF
customers.

(*Id.,* ¶¶10, 14-21, 23).

Petitioner raised the claim, which was asserted in his motion for new trial, as
an assignment of error on direct appeal.  At that juncture, the record did not include
Voelker's affidavit.  The state appellate court rejected the claim, summarily
concluding that petitioner had not demonstrated a "reasonable probability" exists
that had Voelker been subpoenaed by counsel to testify at trial regarding his

25

consultations with petitioner during a brief period in January 2001,[12] "the outcome of the [trial] would have been different." (Doc. 3, Ex. 9, p. 12). The Ohio courts also later refused to grant post-conviction relief to petitioner based on Voelker's affidavit; the courts found such evidence was "cumulative to information already contained in the record . . . previously considered on direct appeal" as well as insufficient "to advance petitioner's ineffective assistance claim beyond 'mere hypothesis.'" (*Id.,* Ex. 17, p. 9; Ex. 21, p. 6).

Unpersuaded by the state courts' summary rejection of petitioner's ineffective assistance of counsel claim without further development of the record, this Court ruled that an evidentiary hearing was necessary because "Voelker's affidavit presented additional, significant information about Voelker's willingness to testify on petitioner's behalf at trial without issuance of a subpoena, as well as the substance of the testimony he would have given to prove lack of intent on petitioner's part 'to take money and not perform on the contracts.'" (Doc. 11, p. 24; *see also* Doc. 19).

## 2. Evidence Adduced Herein Re: Voelker's Omission As A Defense Witness

At the evidentiary hearing held in this matter, Voelker testified that he was hired by petitioner and Timothy Hicks to provide legal advice regarding APF's financial problems that stemmed from (1) APF's owing $45,000 to Firstar Bank as a result of Dan Hicks' check-kiting activities, and (2) the lack of funds to complete construction projects for customers who were "owed money" by APF. (Doc. 33, Tr. 83-84).

Voelker testified that petitioner and Timothy Hicks advised him that they were trying to finish projects "to the extent they could, [where] there was material or something at the site, . . . but the financial means just were not there to complete what had been started." (*Id.,* Tr. 84). On cross-examination, Voelker agreed that "one of the things" petitioner expressed was the desire to complete the projects that had been started, where "there was material at a number of the job sites." (*Id.*). They determined, however, that it would be impossible for APF to complete these

---

[12] Specifically, the Ohio Court of Appeals pointed out that Voelker met with petitioner for the first time during the week of January 15, 2001, was paid a $500 fee on January 17, 2001, and sent out a letter on January 18, 2001 informing APF's customers that the company was going out of business effective January 26, 2001. (Doc. 3, Ex. 9, p. 12).

projects because Firstar Bank was demanding $45,000 from the company and because more materials were needed on the sites to finish the projects.  (*Id.,* Tr. 90-91).

Voelker stated that petitioner provided him with a list of APF's customers and financial records from Firstar Bank.  (*Id.,* Tr.. 85).  Voelker did not independently investigate APF's business dealings; instead, his "frame of reference was what the Hicks brothers told [him] and the Firstar Bank records."  (*Id.*).

Voelker testified that he discussed the possibility of filing for bankruptcy with petitioner and Timothy Hicks, but that they did not have the financial means to do so.  (*Id.,* Tr. 84-85).  To assist the brothers in dealing with customers who were "calling . . . incessantly . . . very upset," Voelker sent out a letter to each of the customers on the list that had been provided to him alerting them that APF was going out of business.  (*Id.,* Tr. 85).  The letter, which was dated January 18, 2001, provided:

> I have been retained by APF . . . to communicate that effective January 26, 2001 APF will no longer be in business.
>
> I regret to inform you of the Company's decision, and I regret any inconvenience this may cause you.  Please direct all future correspondence to my office.
>
> If you have any questions or concerns please do not hesitate to call my office.

(Doc. 29, O'Hara Deposition Tr., Ex. B).

It appears that Voelker also assisted petitioner in trying to work out a plan to repay the debt owed Firstar Bank.[13]  Because "based upon the bank account records, it was pretty much a no-brainer that the corporate veil would be pierced," petitioner expressed to Voelker that he "was willing to just take a personal judgment in order to resolve" the issue without having to involve his brother Tim.

---

[13]  Indeed, it appears from comments made by O'Hara at trial that Voelker may have represented APF and the Hicks brothers in a civil lawsuit that was filed against them by Firstar Bank.  (*See* Doc. 16, Tr. 1098).

27

(Doc. 33, Tr. 91). A deposition apparently was scheduled because the parties could not "come to an understanding on repaying the debt." (*Id., Tr. 92*). Voelker cancelled the deposition and ceased involvement in the matter, however, as he was advised at that time by Firstar's attorney that petitioner and Timothy Hicks were subjects of a criminal investigation. (*Id.*). Voelker indicated at the evidentiary hearing that his assistance in the civil matter ended two to three months after his initial meeting with the Hicks brothers in mid-January 2001. (*Id., Tr. 95*).

Voelker testified that it was his understanding that APF ceased doing business after he sent out the letter advising customers of APF's closing effective January 26, 2001. (*Id., Tr. 86*). When he agreed to testify on petitioner's behalf at the state criminal trial, he was unaware of any further requests for money from APF customers after the letter was sent out; nor was he aware that petitioner had been convicted of theft in 1989 or of grand theft in 1994 for failing to build a pole barn. (*Id., Tr. 86-87 & Resp. Exs. 3-4*). Finally, Voelker was not aware that APF had a business account in a bank other than Firstar. (*Id., Tr. 88*).

Voelker was first informed of petitioner's prior convictions and of APF's bank account with Fifth Third Bank in preparing for the evidentiary hearing in this case. (*Id., Tr. 88-89*). When asked about his reaction to this new information, Voelker testified:

> . . . I was shocked from the standpoint of that I . . . didn't know about it at the time, and the issue with Firstar was an issue of what on paper appeared to be money going in and out from Mr. Dan Hicks which it wasn't – that was the only bank account I had looked at and so it was just – I guess maybe I could have . . . advised better at the time had I seen both bank accounts and tried to piece together the involvement of all the parties.

(*Id., Tr. 89*).

Voelker later was asked whether petitioner's prior convictions had any effect on his opinion regarding petitioner's criminal intent in this case. (*Id., Tr. 97*). Voelker replied:

> . . . .I think in my mind as I sit here today, the more important issue I'd like to see the Fifth Third Bank records. I don't think because . . .

28

someone said something wrong in the past, that that immediately
means they're prone to do something in the future, but certainly it
would impact, . . . my personal judgment of someone; but, obviously
... the most important thing I'd want to look at is the bank records
because, you know, when we're dealing with money going in and out
of a bank, it's in black and white, and . . . that would be the more
important information for me to know.

(*Id.,* Tr. 97-98).

Voelker stated that he was prepared to testify as a defense witness at
petitioner's trial, and gave Michael O'Hara his cell phone number.  Voelker said:
"The only thing I asked is because there was some involvement with Tim, . . . that
we ha[ve] a discussion with the judge to make sure [of] the parameters in which I
would testify so as to not breach my attorney-client privilege." (*Id.,* Tr. 93-94).
Voelker later explained: "[T]here was no condition that you must subpoena me.
There was no condition that, no, I will not come absent a Court order.  It was just
that I wanted clarification . . . that I was okay to be a witness in the case, and I was
looking for that from the judge." (*Id.,* Tr. 98).[14]

O'Hara testified at his deposition that he spoke with Voelker two or three
times before the trial and one or two times after the trial started.  (Doc. 29, O'Hara
Deposition Tr. 24).  He contacted Voelker in part because petitioner "thought that
Mr. Voelker would be a good witness to help him out and repeatedly told [O'Hara]
of Voelker's impression that none of this amounted to . . . a crime." (*Id.*).

O'Hara considered calling Voelker as a defense witness because he "thought
that it would be an extremely strong argument to present to the jury that

---

[14]  This concern was argued as a justification in support of petitioner's and Timothy
Hicks' motions to sever the trial.  Specifically, it was argued that by calling Voelker as a defense
witness, petitioner was "obviously interested in waiving any attorney-client privilege when Tim
Hicks is not." (*See* Doc. 31, Tr. 6; *see also id.,* Tr.17).  During the hearing, the trial judge also
raised the question whether the individual defendants had the right to waive the attorney-client
privilege of the corporate entity. (*Id.,* Tr. 14-16).  Without deciding the question, the judge
stated that it ultimately was an issue that had to be decided by the court, and might have "to be
more thoroughly fleshed out" with many "land mines out there for everybody involved." (*Id.,*
Tr. 15-16).  Therefore, Voelker's concern about needing clarification from the court apparently
was a legitimate one.

[petitioner] contacted counsel, received counsel and followed the advice of counsel in dealing with business problems that APF experienced." (*Id.,* Tr. 25). O'Hara testified that he ultimately decided not to call Voelker as a defense witness because his testimony "would not have been helpful" to petitioner. (*Id.*).

Specifically, O'Hara expressed concern that Voelker was not aware of "all the things that Mr. Bill Hicks was doing" in running APF's business. (Doc. 33, Tr. 112). According to O'Hara, there was evidence showing that "APF and in particular Mr. Bill Hicks" acted against Voelker's advice and continued doing business by requesting additional money from customers *after* Voelker sent out the letter informing customers that APF was going out of business. (*Id.,* Tr. 113; *see also* Doc. 29, O'Hara Deposition Tr. 26-29). O'Hara explained:

> I thought if that [evidence] came to light, that any argument that [petitioner] was in any way an innocent victim of his brother Dan or that he did not intend to take money from some people and not perform the services promised them, there was no argument about that. I think that he would have sealed the arguments about intent and about Dan being the problem.

(Doc. 33, Tr. 113; *see also* Doc. 29, O'Hara Deposition Tr. 27).

Upon review of the trial transcript, however, it appears that during the presentation of petitioner's defense at trial, O'Hara did express his intention to call Voelker as a defense witness. (*See* Doc. 16, Tr. 1097). Apparently, the issue was first brought up off the record during a break in the trial, but the judge decided it should be discussed on the record. (*Id.*).

David Brewer began by stating on the record that O'Hara had asked his client, Timothy Hicks, to sign a waiver so that Voelker could testify about "whatever he wanted," including the civil lawsuit filed against APF and the Hicks brothers in their personal capacity. (*Id.,* Tr. 1097-98). Brewer made it clear that his client would not sign any waiver of his attorney-client privilege "to bring in inadmissible testimony" from Voelker. (*Id.,* Tr. 1098).

The trial judge asked whether Voelker was present. (*Id.,* Tr. 1099). The following colloquy ensued:

30

O'HARA:  No, sir.  He's in Covington.

COURT:  Is he going to be here?

O'HARA:  He will be here if a release is signed for him to come and testify.

COURT:  A release signed by Mr. Timothy Hicks[?]

O'HARA:  Correct, Judge.

COURT:  Are you suggesting that I have the authority to compel Mr. Hicks to waive his attorney-client privilege?

O'HARA:  I'm not suggesting that at all.

COURT:  So then what is the issue?  What is the issue you are asking me to resolve?  I'm not going to order Mr. Voelker to testify in this particular case if he claims that he has an attorney-client privilege.  And there is lots of little separate issues involved in this particular case because we really have three separate parties to which he obviously represents, and obviously there is APF, which by everybody's agreement is an Ohio corporation. . . .

****

. . . .[W]e really have three privileges and not just two privileges to deal with in this particular case.  And the question is that if Mr. William Hicks and Mr. Timothy Hicks are essentially accused of stealing from the corporation money that is not appropriately theirs, ... the question is can they then, in turn, waive – clearly Mr. Timothy Hicks is not willing to waive his attorney-client privilege.

The question then is can Mr. William Hicks, especially since he's accused of taking money improperly out of the corporation, can he waive that attorney-client privilege on behalf of the corporation?  And that's an issue I raised very early and suggested that that's something people should be comfortable addressing.  Obviously nobody has

31

addressed that.

(*Id.*, Tr. 1099-1101).

O'Hara pointed out that petitioner was the "100 percent owner" of APF, and prosecuting attorney Ferguson clarified for the record that APF's articles of incorporation reflected that petitioner was the incorporator. (*Id.*, Tr. 1101-02). The colloquy continued:

> COURT: Well, I don't even have to get in[to] that issue. If the man show[s] up, then I will get into the issue of whether or not . . . your client is going to waive attorney-client privilege on behalf of APF.

> O'HARA: That puts me in a catch-22. Mr. Voelker is not willing to drive here an hour to show up here to find out whether or not he's going to testify.

> COURT: Well, if he's probably subpoenaed, and doesn't show up, he's in contempt of the Court's subpoena. . . .

> **** 

> Only if you didn't subpoena him, then clearly you would have no right to compel his testimony. . . .

> So if he shows up, I will deal with it. If he's not properly subpoenaed, then I don't see how I could even consider that. Okay?

> O'HARA: I have not issued such a subpoena, Your Honor. *My understanding was that . . . he was to come by agreement, and that there was not going to be any problem with the agreement.*

> COURT: I can't deal with what your agreement was between your co-counsel. That's not my issue. I can only compel testimony if a person has been properly served with a subpoena.

(*Id.,* Tr. 1102-04) (emphasis added).

32

At that juncture in the colloquy, O'Hara moved for a mistrial, arguing that Voelker's testimony on petitioner's behalf was why the two defendants had moved to sever the trial and that Voelker's testimony "is part of our defense." (*Id.,* Tr. 1104).  The trial judge responded:

> There was never any suggestion to me before this moment that there was any conflict between that – it was always – if you go back when this original attorney-client privilege issue was raised, it was never whether or not Timothy Hicks or William Hicks were willing to raise it.  And it was an issue I raised and not you.
>
> I raised it as to whether or not Timothy Hicks or William Hicks could waive the attorney-client privilege of APF.  I suggested that perhaps it could not.  And I raised it early because I wanted the issue to be addressed early.
>
> Obviously everybody chose to ignore an issue that was very much out here in my mind because I raised it in the pretrial hearing [on the defendants' motions to sever].  And I suggested to everybody that this was an issue of this case, if this witness would testify, there are issues of privilege that should be addressed.  I got no motion in limine.  I have nothing.  And quite honestly if he's not subpoenaed as a witness, I don't have to deal with it.

(*Id.,* Tr. 1104-05).

O'Hara took exception to this response, which the court subsequently confirmed constituted a denial of the motion for mistrial; O'Hara reiterated that it was his understanding that "there was not going to be a problem." (*Id.,* Tr. 1105).

### 3.  Findings of Fact and Conclusions of Law

### a.  Counsel's Conduct Was Deficient To The Extent O'Hara Failed To Seek The Removal Of Barriers To Voelker's Testimony Prior To The Joint Trial.

Under the first prong of the *Strickland* test discussed above, petitioner must demonstrate that his trial counsel's conduct in failing to call (or subpoena) Brandon Voelker as a defense witness fell below an objective standard of

33

reasonableness based on all the circumstances surrounding the case. *See Strickland,* 466 U.S. at 688.

Based on testimony elicited from O'Hara at the evidentiary hearing, it apparently is respondent's position that O'Hara did not act unreasonably because he ultimately decided as a matter of trial strategy that Voelker's testimony would not benefit petitioner and, indeed, might serve to undermine the defense theories that petitioner lacked the requisite criminal intent and that APF's failure to fulfill its contractual obligations to paying customers was attributable solely to Dan Hicks' criminal actions. The trial record belies this position. Indeed, upon review of the trial transcript, the undersigned is left with no doubt that O'Hara intended to call Voelker as a defense witness, and considered Voelker's testimony so critical that he moved for a mistrial when it became apparent to him during the trial that neither David Brewer, as Timothy Hicks' counsel, nor the trial judge would agree to a waiver of the attorney-client privilege for Timothy Hicks or APF in advance of Voelker's appearance at trial.

It is undisputed that Voelker was willing to testify on petitioner's behalf, and, therefore, O'Hara had no reason to believe that a subpoena was necessary to secure Voelker's appearance. However, O'Hara was well aware early on in the case that the attorney-client privilege posed a significant potential barrier to Voelker's testimony in the joint trial of petitioner and Timothy Hicks. At the pretrial hearing on the brothers' motions to sever the trial, where the concern was raised as a justification for severance, the court added that there was another potential issue, which needed to be "fleshed out," as to whether APF's attorney-client privilege could be waived by either of the individual defendants. (*See* Doc. 31, Tr. 15-16). Furthermore, Voelker himself testified that although he was willing to appear as a defense witness at petitioner's trial without a court order compelling him to do so, he told O'Hara that he wanted to first have a discussion with the trial judge about the parameters of his testimony to ensure that there would not be any breach of the attorney-client privilege in testifying on petitioner's behalf.

O'Hara argued that it was his understanding that there was "not going to be any problem" with Voelker's testifying based on the parties' "agreement." (*See* Doc. 16, Tr. 1103-04, 1105). However, upon review of the record, it appears that no "agreement" was reached and, in fact, the issue was flagged at the pretrial hearing on the motions to sever as a potential problem which should be resolved prior to trial.

34

Specifically, Brewer indicated at that hearing that, in contrast to petitioner, his client was not willing to waive any attorney-client privilege if O'Hara called Voelker to testify at trial. (Doc. 31, Tr. 6). O'Hara later expressed his understanding of Brewer's position when he argued as follows in support of his motion to sever: "[I]f Timothy goes first, he can have a trial in which Brandon Voelker does not testify. And if William Hicks goes after him, he can have a trial in which Brandon Voelker does testify. And that seems to be . . . a solution that will protect the important rights of both of these defendants." (*Id.*, Tr. 17).

In addition, with respect to the separate issue of the corporation's attorney-client privilege, the trial judge pointed out that "it may be that because of the criminal charges pending against these defendants that they cannot waive that privilege." (*Id.,* Tr. 28). The court did not decide the matter at that time, but advised counsel that it was an issue "both sides should feel comfortable [about] at the time of trial because I think you are going to find that the corporation probably ... cannot have the[] privilege waived by the two defendants who are charged with crimes." (*Id.,* Tr. 29).

Despite the court's express admonition to address the matter before trial, as well as Voelker's request of O'Hara to obtain "clarification" from the court about the potential restriction on his ability to testify at trial, it appears that O'Hara did nothing prior to the trial to ensure that the attorney-client privilege would not pose a barrier to Voelker's appearing as a defense witness on petitioner's behalf. As the trial judge stated in denying O'Hara's motion for mistrial, no motion in limine or other pleading was filed to obtain co-defendant Timothy Hicks' and APF's waiver of the attorney-client privilege or otherwise to remove potential barriers to Voelker's testimony at trial. (*See* Doc. 16, Tr. 1105).

Instead, O'Hara belatedly brought the matter to the court's attention during trial at the close of the presentation of petitioner's case, when he relayed his intention to call Voelker as a witness and asked Timothy Hicks to sign a waiver of his attorney-client privilege. At that point, O'Hara found himself in a "catch-22" situation, because Timothy Hicks would not sign the waiver and the court refused to address whether APF's attorney-client privilege could be waived unless Voelker were present either voluntarily or by way of subpoena.

Although O'Hara could have requested that he be given the opportunity to bring Voelker before the court for the purpose of obtaining a ruling on the

35

corporate attorney-client privilege issue, he did not do so.  Counsel's failure to
pursue the matter further may have been unreasonable.  But even assuming, as
O'Hara apparently believed, that only a mistrial could have been requested at that
point in the trial proceeding, the undersigned finds that it fell outside the wide
range of reasonable professional assistance for O'Hara to ignore the significant
barriers to Voelker's serving as a defense witness, which were brought out at the
pretrial hearing on the defendants' motions to sever the trial.  O'Hara acted
unreasonably by failing to heed Voelker's request and the trial judge's express
admonition to seek resolution of the matter in petitioner's favor prior to
commencement of the trial.

Therefore, petitioner has demonstrated that his trial counsel's performance
was constitutionally deficient under the first prong of the *Strickland* test to the
extent that O'Hara failed to seek the removal of known barriers to Voelker's
testimony on petitioner's behalf *before* the trial began.

## b.  Petitioner Has Not Demonstrated He Is Entitled To Relief  Under The Second "Prejudice" Prong of *Strickland*.

Although petitioner has shown counsel's challenged conduct was deficient
within the meaning of the Sixth Amendment, he is not entitled to relief unless he
also demonstrates such conduct prejudiced the defense.  *See Strickland*, 466 U.S. at
687.  To satisfy this second prong of the *Strickland* test, petitioner would need to
show that a "reasonable probability" exists that, but for counsel's error, the result
of the trial would have been different, or in other words, that the result of his trial
would "reasonably likely have been different absent the error[]."  *See id.* at 694-95.

Here, it is unclear what Voelker would have been allowed to say at trial in
the absence of Timothy Hicks' or APF's waiver of the attorney-client privilege.
The undersigned will assume in petitioner's favor, however, that Voelker would
have been able to fully testify, as he has averred in his affidavit attached to
petitioner's state post-conviction petition, regarding his belief that petitioner lacked
the criminal intent "to take money and not perform on [APF customer] contracts."
(*See* Doc. 3, Ex. 14, attached Def. Ex. O).

Although such testimony is undoubtedly favorable, Voelker acknowledged
at the evidentiary hearing that when he agreed to testify on petitioner's behalf, he
was not aware of certain information which would have affected his assessment of

36

the situation, specifically, petitioner's past criminal record and APF's Fifth Third Bank records.  Voelker was less concerned about petitioner's prior theft convictions, which he confessed impacted his "personal judgment" of petitioner, but expressed that he was "shocked" the Fifth Third Bank records had not been provided to him when he was advising and representing APF and the Hicks brothers in the civil matters relating to the closing of the business.  Voelker indicated that the information contained in the Fifth Third Bank records would have been "important" to know in forming an opinion about petitioner's "intent."

The Fifth Third Bank records were introduced into evidence in the prosecution's case-in-chief to establish guilt.[15]  Specifically, evidence was presented that the Firstar Bank account, which Dan Hicks had used to artificially inflate APF's bank balance by depositing bad checks into the account to cover phony contracts, was "completely depleted" by September 20, 2000, ultimately revealing a negative balance of approximately $67,500 by the end of October 2000.  (Doc. 16, Tr. 94-95, 882-84).  In this same time frame, a new account with Fifth Third Bank was opened with funds from the Firstar account–i.e., a $25,000 certified check dated September 20, 2000, which was signed by petitioner, as well as $12,000 in cash, which one can infer was obtained when petitioner's wife cashed a $12,000 check from petitioner out of the Firstar account that was dated September 18, 2000.  (*See id.,* Tr. 96-97, 113-14, 883-84).  These transactions occurred within a few days after petitioner and Timothy Hicks confronted Dan Hicks on September 18, 2000 about his illegal activities and ended his employment with APF.  (*See id.,* Tr. 654-56).

During closing argument, prosecuting attorney Ferguson argued that the jury could infer from this evidence that petitioner had the requisite criminal intent.  Specifically, Ferguson contended:

> You are entitled to infer intent to Bill based on the not-so-voluntary contribution to Firstar Bank. . . .  Remember Dan Hicks confesses evening of the 18th.  The 19th Bill Hicks opens up Fifth Third Bank

---

[15]  As the prosecutor pointed out in opening statements at trial, petitioner and Timothy Hicks were "not charged with the transactions that occurred with respect to Firstar Bank."  (Doc. 16, Tr. 30).  Instead, the charges stemmed from their actions, including the opening of the Fifth Third Bank account, after they discovered Dan Hicks' criminal activities with respect to the Firstar Bank account.

account with $12,000 he had just taken out of Firstar. The 20th he goes to Firstar and gets a $25,000 cashier's check, takes it over to Fifth Third Bank and transfers funds over and leaves Firstar holding the bag.

(*Id.,* Tr. 1397).

At the evidentiary hearing, Ferguson specifically testified regarding his examination of <u>all</u> APF bank records "in deciding whether to prosecute this case, trying to make the distinction between a good business gone bad and a bad business, someone with an intent to steal." (Doc. 33, Tr. 54). Ferguson pointed out that when petitioner and Tim Hicks found out that Dan Hicks had "in essence artificially inflated the bank balance for the company to the tune of $67,500" and confronted Dan about it, "if they had all stopped right there, those checks would have . . . bounced and the bank balance [at Firstar] would have gone back down to where it was supposed to be and they could continue to operate legitimately." (*Id.,* Tr. 55-56). However, instead, "Bill Hicks . . . went to the bank and took that money out, moved it across the street to another account and opened up a different account with that money and proceeded basically to spend the money." (*Id.,* Tr. 56). Ferguson continued:

So we were able to go to the jury and say, . . . not only were the buildings that didn't get built funded by people who paid for those buildings and wanted them built, but in addition to that, there was additional capital put into this company by the contractors and the material men who provided services and materials and didn't get paid. *And finally, Mr. Hicks gets this windfall, albeit an illegal windfall. But had he been serious about wanting to build the buildings, there was money he could have used to build buildings, and instead he basically took that money.*

(*Id.*) (emphasis added).

The undersigned finds,, therefore, that the Fifth Third Bank records were highly incriminating on the issue of petitioner's criminal intent. Because petitioner did not provide these records to Voelker, it is not reasonably likely that Voelker's testimony in petitioner's favor based on incomplete information would have affected the outcome of the trial. Such testimony would have been given little

38

weight once the jury was made aware of the fact that Voelker was not fully informed. Moreover, if Voelker had testified at trial, his testimony might have actually damaged petitioner's case to the extent the jury could have inferred that by failing to disclose important financial records to Voelker, petitioner sought to hide evidence of his criminal activities from counsel retained to assist in a civil capacity.

Finally, had Voelker testified at petitioner's trial, further incriminating evidence likely would have come out regarding petitioner's attempts to solicit money from APF customers *after* Voelker sent out the letter informing customers of APF's closing effective January 26, 2001. (*See* Doc. 33, Tr. 60, 113). As O'Hara pointed out, this information would not have benefited the defense and, indeed, could have served to seriously undermine the defense position that petitioner lacked the requisite intent to defraud APF customers and that all of APF's problems in fulfilling its contractual obligations stemmed from Dan Hicks' criminal activities in the period preceding the company's demise. (*Id.,* Tr. 113; *see also* Doc. 29, O'Hara Deposition Tr. 27).

Accordingly, in sum, although O'Hara acted unreasonably in failing to ensure in advance of trial that Voelker would be able to testify as a defense witness without breaching Timothy Hicks' or APF's attorney-client privilege, petitioner has not demonstrated that absent counsel's error, it is reasonably likely the result of the trial would have been different. Therefore, petitioner is not entitled to federal habeas relief based on this claim of ineffectiveness by trial counsel.

## C. Petitioner Is Not Entitled To Relief Based On The Claim Stemming From Counsel's Failure To Call Satisfied Customers As Defense Witnesses

Finally, petitioner has alleged that his trial counsel, Michael O'Hara, was ineffective because he failed to call satisfied customers of APF as defense witnesses. Petitioner contends these witnesses would have served to "rebut the inference Hicks was in the construction business for the purpose of stealing money" or was engaged in a pattern of corrupt activity (*See* Doc. 9, p. 13).

### 1. Background: State Court Proceedings

No satisfied customers of APF were called to testify on either petitioner's or

39

Timothy Hicks' behalf at trial.  In contrast, numerous dissatisfied customers of APF during the relevant time period of March 2000 through January 2001 were called to testify for the State.[16]

Petitioner first raised the claim that satisfied customers should have been called as defense witnesses in his motion for new trial filed prior to sentencing.  No affidavits from satisfied customers were attached to that motion, nor did any satisfied customers appear at the hearing held concerning the motion.  At the hearing, Gregory Howard only argued in general terms on petitioner's behalf as follows:

> Mr. Hicks . . . had provided Mr. O'Hara with the list of prior customers of his, that he wanted subpoenaed into court to testify in regards to the work that he had done for those people.  And the fact that there may have been delays and material and whatever, but those people were all satisfied customers of the business that Mr. Hicks had engaged in.

> Mr. O'Hara represented to his client, William Hicks, I don't want to call those people, because I don't want to expose you to any sort of civil liability relating to any warranty problems that you may have with those buildings.  This is ridiculous.  You call those people.  You have an obligation to defend your client. . .  And maybe that's what he did.  Maybe he did represent them to the best of his abilities.

> But Mr. Hicks would have been better off in this case if he represented himself.

(Doc. 3, Ex. 4, Tr. 8-9).

Prosecuting attorney Dan Ferguson responded:

---

[16]  APF completed the project of one of these customers, Susan Wund, who contracted with APF in March 2000 to build a garage on her property.  The project was completed in October 2000 for a total cost of approximately $20,000, which was paid in full by Wund.  (*See* Doc. 16, Tr. 807-08).  In January 2001, however, Wund received notice that a lien had been placed on the property for $2,850.36 because one of the subcontractors on the project had not been paid.  (*Id.,* Tr. 808-09).

. . . .Mr. Howard raised the issue of how Mr. Hicks wanted prior customers who were satisfied customers, . . . but the State acknowledged as early as opening argument that there were satisfied customers.  He never disputed there were satisfied customers.  He never disputed that there were some satisfied customers out there, in fact, a number of them – and there was evidence put on to the effect during the course of trial by a number of witnesses.

Mr. Tim Hicks, in fact, testified that there were buildings built, that there were customers satisfied, and [another witness] from the attorney general's office stated that upon review of the checking account records, there were a number of people who had written checks, identified, and that there were only a portion of them who came forward as victims of this case.

Mr. Dan Hicks testified that buildings were built.  Jay Burton and Charlie Hyatt testified that there were buildings built, so there was certainly ample evidence put on during the course of this trial.  Whether they were put on by Mr. O'Hara or not doesn't matter.  The facts got to the jury, the buildings were being built, and there absolutely could be no possibility of any prejudice to Mr. Hicks with respect to that issue and additional witnesses to come in and say, yeah, I got a building, and I've been satisfied with it, [would be] repetitive and cumulative evidence of what was already in the record many times over.

(*Id.,* Tr. 23-24).

    After hearing both sides, the trial court rejected petitioner's claim, reasoning:

As far as the satisfied customer not being called, first of all, I would suggest that if anybody sat through six days of this trial, that that was an issue that was frequently raised, and there were many satisfied customers out there, and that a lot of the delays in this particular case were not due to an attempt to defraud the victims, but were due to unrelated matters such as the volume of cases, or the volume of buildings pending, and were due to weather delays, et cetera. . . .

41

> . . . .[T]here was certainly lots of discussion, and from the very
> beginning of this trial . . ., that there were lots of satisfied customers.
> So I think that . . . if the Court [had] been presented with witnesses
> who would come in here and say, ["] I'm a satisfied customer,["] I
> probably would have permitted that, but probably not very much
> because I consider it somewhat cumulative, and to some extent,
> irrelevant to the issues in front of the Court.  So I would have
> probably restricted that testimony anyway.

(*Id.,* Tr. 43-44).

The Ohio Court of Appeals affirmed the trial court's decision on direct
appeal.  The state appellate court summarily determined that petitioner failed to
"meet the prejudice prong under the *Strickland* test" because "testimony was
presented at trial that there were buildings built" and "[t]estimony was also
presented by an investigator for the Ohio Attorney General['s] Office, and by a
customer who had contacted eight to ten references before contracting with APF
and found satisfied customers."  (*Id.,* Ex. 9, p. 11).

While petitioner's direct appeal was pending before the Ohio Court of
Appeals, petitioner's current counsel raised the same claim in petitioner's state
post-conviction petition.  Attached to the petition were letters or affidavits from
twelve "satisfied customers" of APF.  (*Id.,* Ex. 14, Def. Exs. B-N).  Five of these
letters or affidavits failed to mention when the projects were done, and six
pertained to projects in 1998 or 1999 before the charged criminal offenses
occurred.  Only one letter referred to a project completed in the relevant time
period of March 2000 through January 2001.  (*See id.,* Def. Ex. I).  In that letter,
Randall Durkin stated generally that a building was "started on time and was
completed in approximately four days.  6-29-00."  He also said that the
"completed building and the materials used w[ere] satisfactory."  (*Id.*).

The state courts rejected petitioner's claim based on the post-hoc statements
of satisfied APF customers; they found that the statements were "cumulative to
information already contained in the record which was previously considered on
direct appeal."  (*Id.,* Ex. 17, p. 9; *see also id.,* Ex. 21, p. 5).

Upon thorough review of the 1,526-page trial transcript, it appears that the
following comprised the references made at trial regarding APF's satisfied

customers:

> In opening statements, the prosecuting attorney mentioned in passing that some buildings were built and that Timothy Hicks "was out in the field at least making some effort to build some buildings from time to time." (Doc. 16, Tr. 46-47).

> The prosecutor also later stated that "there was a time when they were building some barns," and that the jury was "going to see the supplier records that relate to specific jobs that got built during this time period" although the suppliers did not get paid in "a lot of the cases." (*Id.,* Tr. 66).   The prosecutor explained:

>> "Understand, it wasn't just walk in and take money and never build anything. . . . [Y]ou will fully understand after you see and hear the evidence how they maximized their profits, how they built the buildings, how they didn't pay the suppliers, they didn't build the buildings, they took extra cash flow from the bank that didn't belong to them and still they didn't build the buildings.

> (*Id.,* Tr. 67-68).

> O'Hara mentioned in his opening statement that petitioner and Timothy Hicks worked for "a long time" together before Dan Hicks joined them in the business and that "for much of the time . . . they had satisfied customers and lots of satisfied customers." (*Id.,* Tr. 70).

> One of APF's dissatisfied customers testified that a person at his work who had referred APF to him, contracted with APF to build a garage in March 2000, which was finally built right before APF went out of business in January 2001. (*Id.,* Tr. 177, 200, 202).

> Another dissatisfied customer testified that before contracting with APF in July 2000, she contacted eight to ten prior APF customers who for the "most part . . . were pretty much happy" with the work that had been done for them. (*Id.,* Tr. 261-62).

A third dissatisfied customer testified that she contacted APF to do work for her when she saw a garage APF had built for a neighbor, which looked "fine." (*Id.,* Tr. 444-45).

In his lengthy testimony, Dan Hicks briefly indicated at one point that there were buildings "going up" when he worked at APF. (*Id.,* Tr. 730). Later, on cross-examination by Timothy Hicks' counsel, Dan Hicks testified that during the time he was at APF from May to September 2000, Timothy Hicks was "out in the field working" and that there were some crews "actually working in the field putting up pole barns." (*Id.,* Tr. 762-63). On redirect examination by the prosecutor, Dan Hicks stated that in August 2000, APF had seven or eight employees, who were "[w]orking in the field" putting up buildings. (*Id.,* Tr. 777-78). Dan Hicks, however, did not know how many buildings were erected in the months between May and December 2000. (*Id.,* Tr. 778).

Kimberly Picklesimer, an investigator with the Ohio Attorney General's Office, testified that in the course of contacting people who had written checks to APF, she found some were "satisfied customers. There were some [who] had their barns built. Bill complained of shoddy work. There were some [who] did not get anything at all." (*Id.,* Tr. 843).

Charles Hyatt, petitioner's brother-in-law, testified that he was employed at APF as a "field supervisor" and that during the "last couple of months of the business," he, Tim Hicks, and two other employees worked together to finish up the "last few buildings." (*Id.,* Tr. 1157-58). Hyatt testified that he worked "all the time except rain days." (*Id.,* Tr. 1161). The only customer complaints he knew about were "if their job was behind for some reason." (*Id.,* Tr. 1162).

Jay Burton, who worked at APF for two years, testified that he never looked at the project board at the office and thought "there is no way we would ever complete it." (*Id.,* Tr. 1204). He said that "[a]s long as there was jobs, there was work, so we [were] fine. Sometimes we got backed up, I assume. But we went out and did our best to try and do them." (*Id.*).

44

Timothy Hicks testified that he did not think APF was going out of business because "[t]here was work there. People were working and there were jobs being done all year." (*Id.,* Tr. 1239). He mentioned at another point that sometime in the summer of 2000, he received "extra money" when he worked seven days straight on a building that he "put a gambrel style roof on" and "shingled." (*Id.,* Tr. 1250).

Michael O'Hara sought to elicit testimony from Timothy Hicks on cross-examination regarding various individuals, who apparently were satisfied customers of APF to the extent their projects were completed. (*See id.,* Tr. 1279-80). David Brewer objected to this line of questioning in part because it "open[ed] the door" for the State to introduce evidence "about other customers who may or may not be satisfied" without having them brought in to appear as witnesses. (*Id.,* Tr. 1280-81). The objection was overruled to the extent Brewer objected "because [he didn't] want to open the door," but sustained on the grounds of relevance and hearsay. (*Id.,* Tr. 1281).

On cross-examination by the prosecutor, Timothy Hicks remembered faxing a list to the prosecutor's office of buildings he and his crew, including petitioner, had worked on and completed during the relevant time frame. (*Id.,* Tr. 1314-15). It came out on further questioning, however, that APF had not paid Holmes Lumber, one its suppliers, for materials used to complete "quite a number" of these projects. (*See id.,* Tr. 1316-18).

## 2. Evidence Adduced Herein Re: APF's Satisfied Customers

Petitioner did not call any satisfied customer of APF to testify at the evidentiary hearing, relying instead on the affidavits already filed of record.

45

Petitioner did himself directly address the issue by testifying that he had provided O'Hara with two file boxes "full of contracts, names, addresses, phone numbers of every person I ever built a building for in Ohio, Kentucky and Indiana" from the time the business began in 1998 until it closed in January 2001. (Doc. 29, Hicks' Deposition Tr. 9-11; *see also* Doc. 33, Tr. 8). Petitioner testified there were over one hundred contracts in these boxes of completed jobs, where "all material was paid for, customer was happy, everybody was good." (Doc. 29, Hicks' Deposition Tr. 10-11; *see also* Doc. 33, Tr. 8).[17]

Petitioner also stated at his deposition that he gave O'Hara a list of satisfied customers to contact. (Doc. 29, Hicks' Deposition Tr. 19-20). Although he did not have the list with him, he said he would have "liked to have had a hundred customers come in and say William Hicks did this work for us, did a good job, paid for everything" to show that APF was a "good running company." (*Id.,* Tr. 19).

Additional evidence presented by petitioner at the evidentiary hearing in support of his claim was the general testimony of (1) David Brewer to the effect that calling satisfied customers would have helped petitioner's case in the face of "so many dissatisfied customers;" and (2) Gregory Howard, who testified that O'Hara failed to comply with petitioner's request to call certain witnesses to testify on petitioner's behalf at trial. (Doc. 33, Tr. 29, 42, 44).

O'Hara agreed that petitioner provided him with a list of customers whose contracts were fulfilled by APF. (*Id.,* O'Hara Deposition Tr. 11). O'Hara said there were approximately twenty customers on this list, who had work completed during the same period of time that the charged offenses occurred. (Doc. 33, Tr. 110). Prosecuting attorney Ferguson similarly recalled that approximately 15 to 20 pole barns were built during the relevant time period. (*Id.,* Tr. 58).[18] O'Hara actually spoke with ten to twelve of the listed customers, who for the most part

---

[17] Timothy Hicks, who was called by petitioner as a rebuttal witness at the evidentiary hearing, corroborated petitioner's testimony to the extent he testified that there were over 100 contracts in APF's files, and that the company had been in business for two years before he joined it. (Doc. 33, Tr. 170).

[18] Ferguson testified that he obtained the names and addresses of both satisfied and unsatisfied customers from APF's bank records. (Doc. 33, Tr. 75). He said "investigators from the Attorney General's Office went out and knocked on every door that we identified through all of the bank records." (*Id.*). A chart was made, which "listed both the satisfied and the unsatisfied customers." (*Id.*).

were "reasonably satisfied with what they received." (*Id.,* Tr. 127; *see also* Doc. 29, O'Hara Deposition Tr. 17). O'Hara stated that he no longer has this list in his possession, and it his belief that the list was returned to petitioner. (Doc. 29, O'Hara Deposition Tr. 17).

O'Hara testified that he considered calling some of APF's satisfied customers to testify on petitioner's behalf at trial, but decided not to do so after talking with them. (Doc. 33, Tr. 110-11). O'Hara determined the witnesses would not be helpful because none of them "had information about the complaining witnesses or the jobs of the complaining witnesses" and thus did not have "any relevant information about whether or not [petitioner] defrauded the people who were claimed to have been defrauded." (*Id.,* Tr. 111). O'Hara explained in his deposition:

> . . . .I think that what I discussed with Mr. Hicks is that there are about 6 billion people we could call that said he did not defraud them, but that may not make a difference about the 18 or so people he did defraud – or the 18 or so customers saying he did defraud.

(Doc. 29, O'Hara Deposition Tr. 70-71). O'Hara did not include any of APF's satisfied customers on the witness list filed with the court prior to trial. (Doc. 33, Tr. 129).

Finally, Ferguson testified at the evidentiary hearing that the prosecution conceded at trial that a number of the pole barns were in fact built. (*Id.,* Tr. 58). He said he prepared for the possibility that the defense might call satisfied customers. (*Id.,* Tr. 59). When asked what his response to such testimony would have been, Ferguson responded:

> Certainly we would have cross-examined them to ask them if they knew about the unsatisfied customers. Their answer, of course, probably would have been no. We would have cross-examined them to ask if they would know what he was actually doing with the bulk of the money out of his company. Their answer probably would have been no. We would have asked them whether they knew whether or not the contractors who provided the materials for their buildings actually got paid. So I think that as I recollect right now, there were a number of people who got buildings who had contractors and material

47

men [who] never got paid.  Some of them probably didn't know that.

(*Id.*).  On cross-examination, Ferguson agreed that because no satisfied customers testified at trial, "we would have to speculate on what effect they might have on the jury."  (*Id.,* Tr. 76).

### 3.  Findings of Fact and Conclusions of Law

### a.  Petitioner Has Not Met His Burden Of Proving That O'Hara's Failure To Call Satisfied Customers As Defense Witnesses Violated The Constitution.

In this federal habeas case, petitioner "bears the heavy burden of demonstrating that his counsel made an error so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment and that this deficient performance prejudiced his defense.  In other words, the issue is 'whether counsel's performance was so *manifestly* ineffective that defeat was snatched from the hands of probable victory.'"  *Lewis v. Alexander,* 11 F.3d 1349, 1352 (6th Cir. 1993) (quoting *United States v. Morrow,* 977 F.2d 222, 229 (6th Cir. 1992) (en banc), *cert. denied,* 508 U.S. 975 (1993) (emphasis in original)); *see also Whiting v. Burt,* 395 F.3d 602, 617 (6th Cir. 2005) ("Petitioners claiming ineffective assistance of counsel under *Strickland* have a heavy burden of proof."); *Adkins v. Konteh,* No. 3:05cv2978, 2007 WL 461292, at *7 (N.D. Ohio Feb. 7, 2007) (unpublished).  Here, petitioner has not been able to satisfy this heavy burden.

First, upon review of the entire record, the undersigned concludes that petitioner has not established that O'Hara's failure to call APF satisfied customers as defense witnesses fell outside the wide range of reasonable professional assistance, as required under the first prong of the *Strickland* test.  *See Strickland,* 466 U.S. at 688.  Although defense counsel has the "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," *Kimmelman v. Morrison,* 477 U.S. 365, 384 (1986) (quoting *Strickland,* 466 U.S. at 691), it appears from the record that O'Hara did contact or attempt to contact the "satisfied customers" on the list provided to him by petitioner, and in fact spoke with many of these people.  Therefore, petitioner's claim does not turn on the failure of counsel to investigate known leads or to interview witnesses, but rather on whether counsel's strategic decision not to call satisfied customers of APF as defense witnesses was reasonable.

48

In assessing the merits of this claim, the undersigned rejects any suggestion that O'Hara's performance was constitutionally deficient because O'Hara chose not to call witnesses requested by petitioner.  Although an attorney has the duty to consult with his client on important decisions, "counsel may exercise his professional judgment with respect to the viability of certain defenses and evidentiary matters without running afoul of the Sixth Amendment." *Lewis,* 11 F.3d at 1353-54 (pointing out that under American Bar Association standards, decisions such as "what witnesses to call" are within the "exclusive province of defense counsel to make after consultation with his client").

Here, it is unclear from the record why O'Hara decided not to pursue a defense based on the testimony of APF's satisfied customers.  O'Hara testified at the evidentiary hearing that he determined the witnesses would not be helpful, because they had no knowledge of, or any relevant information concerning, the victims who claimed they were defrauded by petitioner.  (*See* Doc. 33, Tr. 111). The undersigned is not persuaded by this reason standing alone.

Some courts have held that the mere existence of some satisfied customers without more is insufficient to prove lack of intent to defraud.  *See, e.g., United States v. Alexander,* 743 F.2d 472, 479 (7th Cir. 1984); *see also Peterman v. U.S. Dep't of Agric.,* 770 F.2d 888, 890 (10th Cir. 1985) (involving deceptive trade practices charge).[19]  However, by the same token, in one reported Ohio Court of Appeals' decision, the court held that in a joint trial on various alleged frauds arising out of the operation of a business, "it was prejudicial error for the trial court to exclude evidence of other acts and transactions during the same period of time [of the alleged deceptive larceny-by-trick acts], offered by the defense to rebut the evidence introduced by the state on the question of fraudulent intent."  *State v. Marinos,* 345 N.E.2d 76, 78-79 (Ohio Ct. App. 9 Dist. 1975).  Therefore, an argument can be made that the testimony of APF's satisfied customers would have been beneficial to the extent it served to rebut the testimony of the numerous dissatisfied customers presented by the State for the purpose of proving the defendants' intent to defraud.

---

[19] *Cf. State v. Post,* No. L-95-153, 1996 WL 532320, at *5, 11 (Ohio Ct. App. 6 Dist. Sept. 20, 1996) (unpublished) (affirming racketeering conviction, wherein the trial court rejected the defendant's "bad business judgment" defense in the face of testimony of 12 satisfied customers introduced by the defendant to rebut the claim that the defendant had engaged in a pattern of corrupt activity).

Nevertheless, upon review of the entire record, reasonable inferences are raised that there may have been other legitimate reasons why APF's satisfied customers were not included on petitioner's witness list. When the issue was first raised at the July 3, 2002 hearing on petitioner's motion for new trial, Gregory Howard gave an entirely different reason for O'Hara's decision; according to Howard, O'Hara told petitioner that he did not want to call the customers to testify at the trial because they might expose petitioner to "civil liability." (Doc. 3, Ex. 4, Tr. 9). Moreover, the undersigned is additionally cognizant that David Brewer also chose not to call APF satisfied customers as defense witnesses for his client,[20] and indeed moved to close the line of questioning as opening the door to the State when O'Hara sought to cross-examine Timothy Hicks regarding APF's satisfied customers who were not present at the trial. Indeed, it was brought out at trial that many of the finished projects involving satisfied customers may have also involved dissatisfied suppliers, who were not paid for the materials used to complete the projects. Therefore, based on all the circumstances surrounding this case and as developed herein, the undersigned is not convinced that O'Hara's conduct with respect to APF's satisfied customers was unreasonable.

In any event, even assuming, *arguendo,* that petitioner has demonstrated that O'Hara's conduct was deficient within the meaning of the Sixth Amendment, petitioner has not satisfied his burden of proof with respect to the second "prejudice" prong of the *Strickland* test.

The only evidence in the record from satisfied customers is set forth in letters and affidavits attached to petitioner's state post-conviction petition. However, only one of these letters pertains to the relevant time period, and this letter was written in general terms only. As Ferguson pointed out at the evidentiary hearing, the testimony of any satisfied APF customer would have been subjected to thorough cross-examination by the prosecution. Moreover, as petitioner's counsel himself brought out on Ferguson's cross-examination at the

---

[20] At the evidentiary hearing, Brewer stated that he did not need to call APF's satisfied customers to testify on Timothy Hicks' behalf at trial. Brewer said: "[F]or me, it was asking [the victims] a simple question or two of what was your contact with Tim Hicks and getting them off the stand as quick as I could get them off. Obviously, for me, it worked." (Doc. 33, Tr. 37-38). However, upon review of the trial transcript, it appears that a large part of Timothy Hicks' defense also was his work in completing and attempting to complete buildings up until the time the business closed.

evidentiary hearing, because the record is devoid of any testimony by APF satisfied customers regarding what the substance of their testimony would have been, or the effect of cross-examination on such testimony, "we would have to speculate on what effect they might have on the jury." (*See* Doc. 33, Tr. 76).

In this case, as the Ohio courts pointed out, evidence came out at trial that some buildings were completed by APF during the relevant time period. More-over, there was overwhelming evidence of guilt presented by the State against petitioner. Specifically, petitioner, together with his brother Dan Hicks, had a prior conviction for a similar offense, which was used to establish "criminal intention." Additionally, petitioner had been involved in another business with Dan Hicks, in which buildings were sold but not built. (*See* Doc. 16, Tr. 663-72, 791-96).

With respect to the instant case, although APF had been in business for two years before the charged criminal offenses occurred, there was evidence presented that by March 1, 2000, APF was already having major financial problems, owing one of its suppliers, Holmes Lumber, approximately $80,000 for materials. (*See id.*, Tr. 314-17). Dan Hicks, who was hired by petitioner soon thereafter, concededly precipitated the downfall of the company with his check-kiting and other criminal activities in the few months before petitioner and Timothy Hicks discovered what he was doing and fired him in September 2000. At that juncture, instead of seeking to rectify the situation, petitioner took advantage of Dan Hicks's artificial inflation of the company's Firstar bank account by depleting that account and opening up a new account at Fifth Third Bank with funds that petitioner knew were not real. In the months following September 2000, petitioner continued withdrawing large sums of money for his personal use from the new account, continued soliciting money from customers even after APF closed its business operations in January 2001, failed to follow through on promises made to customers in order to get them to pay more money for completion of their buildings, and failed to pay suppliers for the materials that were provided to customers.

The trial judge indicated at the hearing on petitioner's motion for new trial that he would have limited the number of satisfied customer witnesses if O'Hara had sought to call them to testify at trial. Given the evidence already in the record regarding the completion of projects during the relevant time period, and in the face of the overwhelming evidence of guilt, it is highly unlikely that these witnesses would have affected the outcome of the trial.

51

Accordingly, in sum, petitioner has not demonstrated that his trial counsel was ineffective in failing to call satisfied APF customers as defense witnesses at his trial. Petitioner, therefore, is not entitled to habeas relief based on such claim.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's remaining ineffective assistance of counsel claims alleged in his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1), which were remanded for evidentiary hearing, be **DENIED** with prejudice.

2. A certificate of appealability should issue with respect to each of the claims that were remanded for evidentiary hearing because petitioner has shown that reasonable jurists could debate whether each such claim should have been resolved in a different manner or that the issues presented are "adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 323-324 (2003) (quoting *Slack v. McDaniel,* 529 U.S. 473, 483-84 (2000)) (in turn quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).[21]

3. With respect to any application by petitioner to proceed on appeal *in forma pauperis*, the Court should certify pursuant to 28 U.S.C. § 1915(a) that an appeal of any Order adopting this Supplemental Report and Recommendation would be taken in "good faith," and, therefore, **GRANT** petitioner leave to proceed on appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).


Date: 5/21/08            s/Timothy S. Black

     cbc                  Timothy S. Black

                        United States Magistrate Judge

J:\BRYANCC\2008 habeas orders\05-774SuppRR-denypet.evidhring-iac-pleaoffer-defensewitnesses.wpd

---

[21] It is noted that in a prior Order, the Court denied a certificate of appealability with respect to the ineffective assistance of counsel claim that was not remanded for evidentiary hearing and which was held to be barred from review as waived. (*See* Doc. 19, p. 5).

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

_____

William J. Hicks,
     Petitioner


     vs                                Case No. 1:05cv774
                                        (Spiegel, S.J.; Black, M.J.)

Warden, Dayton Correctional
Institution
     Respondent

## NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Black, United States Magistrate Judge, in the above-entitled action. Pursuant to Fed. R. Civ. P. 72(b), any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof.   Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s). Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections.  *See* Fed. R. Civ. P. 72(b).  A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal.  *See Thomas v. Arn,* 474  U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).